

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 9, 2020**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **JAKIM EDWARD PEARSON, SR.** | § | **CASE NO. 20-30077** |
| | § | **(Chapter 13)** |
| **Debtor.** | § | |

**MEMORANDUM OPINION AND ORDER SETTING SHOW CAUSE HEARING, PURSUANT TO LOCAL BANKRUPTCY RULE 2090-2(b), FOR JUNE 29, 2020, AT 1:30 P.M., AND DIRECTING ATTORNEY NICHOLAS M. WAJDA TO APPEAR IN PERSON**

## I. Introduction.

This Show Cause Order is directed ultimately at an Internet-Based Law Firm[1] doing business as both Wajda & Associates, APC and Recovery Law Group (and, specifically, a lawyer practicing with such firm).

---

[1] The court uses the term "Internet-Based Law Firm" to refer to a law firm (at least in the bankruptcy legal realm) that solicits clients through its Internet presence or Internet-advertising (without regard to where a client is located geographically), prepares bankruptcy paperwork for the client, and then largely refers a client to a local attorney (*i.e.*, an attorney physically located in the client's home district) for appearing at section 341 meetings and hearings. *See generally* Stephen W. Sather, Ethics and the Internet Law Firm, 35 Am. Bankr. Inst. J. 38 (December 2016) for a useful discussion of this phenomenon.

## II. <u>Background Facts</u>.

On January 6, 2020, Jakim Edward Pearson, Sr. (the "Debtor") filed a case under chapter 13 of the Bankruptcy Code (the "Case") on a *pro se* basis. There were many "red flags" that quickly popped up during the first few weeks of the Case, as will be described below. Despite these "red flags," on the thirtieth day after the Case was filed, attorney Nicholas M. Wajda ("Mr. Wajda") filed the "Debtor's Motion for Substitution of Attorney."[2] In the Motion for Substitution of Attorney, the Debtor desired to have Mr. Wajda substituted in as counsel, in place of the Debtor's *pro se* status.[3] The court signed an order granting the Motion for Substitution of Attorney on February 10, 2020.[4]

In accordance with 11 U.S.C. § 329(a) and Fed. Bankr. P. 2016(b), Mr. Wajda filed his Disclosure of Compensation of Attorney for Debtor (the "Rule 2016(b) Statement").[5] In that filing, Mr. Wajda indicated that he had agreed to represent the Debtor for $3,500.00 (*i.e.,* this court's standard "no look fee" for Chapter 13 debtor representation) and ***that he had already received $1,500.00, presumably postpetition***.[6] At question 4 on the Rule 2016(b) Statement, Mr. Wajda represented as follows: ***"Wajda & Associates may use a local counsel at the 341(a) meeting. Approximately $100-$250 is paid for such appearances. This will result in no additional cost to the Debtor.***"[7] Why might a consumer debtor's lawyer need local counsel? As already indicated,

---

[2] ECF No. 21.

[3] As will later be addressed herein, this was the last date that the automatic stay applied in this Case, since the Debtor had another bankruptcy case dismissed within the one-year period prior to the Petition Date in this Case. 11 U.S.C. § 362(c)(3). Mr. Wajda did not file an emergency motion to extend stay in this Case. There is no way to know, based on the record in this Case, if Mr. Wajda thought that filing such a motion would have been an exercise in futility, at such a late hour (and given certain bad facts), or if he did not do his due diligence to realize the automatic stay in this Case was about to expire.

[4] ECF No. 25.

[5] ECF No. 21, Ex. A.

[6] *Id*.

[7] *Id*.

Wajda & Associates, APC (also d/b/a Recovery Law Group) is an Internet-Based Law Firm. The court takes judicial notice that the State Bar of Texas website shows that, while Mr. Wajda is eligible to practice law in Texas, his "Primary Practice Location" is Los Angeles, California (actually, 6167 Bristol Pkwy Ste 200, Culver City, CA 90230-6649).[8] At questions 5 and 6 of the Rule 2016(b) Statement, Mr. Wajda indicated that he had "agreed to render legal service for all aspects of the bankruptcy case," and he did not carve out any particular service.[9] Mr. Wajda provided the following contact information: Nicholas M. Wajda, Esq., Wajda & Associates, PC, 5430 Lyndon B Johnson Fwy, Ste. 1200, Dallas, TX 75240, nick@recoverylawgroup.com, (214) 396−6008.[10]

The Case soon became very contentious with the filing of the following pleadings: (a) an Emergency Motion of 1st Source Bank to Dismiss Bankruptcy Case, filed February 12, 2020;[11] and (b) Motions of Truist Bank, Successor by Merger to Suntrust Bank, for Relief from the Stay and Co-Debtor Stay, filed January 31, 2020[12] (collectively, the "Creditors' Motions"). Separately, the Chapter 13 Trustee filed a Motion to Dismiss with Prejudice for Five Years, on February 10, 2020[13] and separate Notices of Intent to Dismiss, on February 13 and 18, 2020, due the Debtor's

---

[8] STATE BAR OF TEXAS, Nicholas Michal 'Nicholas' Wajda, https://www.texasbar.com/AM/Template.cfm?Section=Find_A_Lawyer&template=/Customsource/MemberDirectory/MemberDirectoryDetail.cfm&ContactID=355205 (last visited Apr. 8, 2020). Attorneys licensed in the state of Texas must provide their primary practice location to the Texas bar so that it may create a profile and it is mandatory that attorneys update their profile information, including their primary practice location, at least annually. Tex. Gov't Code Ann. § 81.115 (West 2019).

[9] ECF No. 21, Ex. A.

[10] *Id*.

[11] ECF No. 29.

[12] ECF Nos. 15 and 16.

[13] ECF No. 26.

failure to file required paperwork and make his first plan payment[14] (collectively the "Trustee's Pleadings").

Then, on February 18, 2020, the Debtor, through Mr. Wajda, filed his own Motion to Dismiss, stating: "Based on the issues set forth in the various Motions to Dismiss and Notices of Intent to Dismiss filed in this Case Debtor has decided it is not beneficial to continue with this Case, and in the interest of preserving the Court's resources Debtor hereby requests that this Case is dismissed."[15] In other words, let's just pretend this Case never happened.

**III. Summary of Pertinent Information in the Debtor's Voluntary Petition, Schedules, SOFA,[16] and Creditors Matrix that Were Never Amended.**

As the record in this Case would eventually reveal, the Voluntary Petition, Schedules, SOFA, and Creditors Matrix were replete with inaccuracies and omissions. ***They were never amended by the Debtor or Mr. Wajda***.

With regard to the Voluntary Petition, the Debtor listed no aliases or other names that he has used at Question 2. As later described below, the Creditors' Motions and evidence would later indicate that the Debtor has used ***several aliases***, *e.g.* J.H. Overton-Bay; Jay Edward Person; William Harold. In Question 9 of Debtor's Voluntary Petition, where a debtor is asked if he/she has filed any other bankruptcy cases in the prior eight years, the Debtor simply checked "yes" and wrote in "Georgia" as the District and "2019" for the date of the filing (with no case number provided). As later described, the Debtor has filed ***many other cases***. The Debtor's Voluntary Petition listed a Downtown Dallas apartment building as his current residence, and a Dallas P.O. Box address as well, indicating that he had lived in the Northern District of Texas for the majority

[14] ECF Nos. 31 and 36.

[15] ECF No. 38, ¶ 7.

[16] "SOFA" means Statement of Financial Affairs.

of the last 180 days. Meanwhile, on the Debtor's Schedules, the Debtor disclosed that he has a managerial job at a Georgia company (earning $8,130.00 gross salary per month) and listed ownership in a $384,000.00 home in Stone Mountain, Georgia (the "Stone Mountain Home"), showing a secured creditor named Suntrust, with a $734,000.00 claim against it. The Debtor—though allegedly now residing in Texas—attempted to avail himself of Georgia state exemptions.

The only other property Debtor described in his Schedules, besides the Stone Mountain Home, were a BMW 528 vehicle (with Santander shown as a secured creditor) and $1,800 of other personal property. And the only other creditors listed on the Debtor's Schedules were certain taxing authorities and a rental car company. Meanwhile, the Debtor's Creditor Matrix ***only listed two creditors***: Suntrust, and a person named Donnell Smith (showing the Stone Mountain Home as Donnell Smith's address). While the Schedules show no co-debtors, the mortgage holder on the Stone Mountain Home later presented information to this court that Donnell Smith is, in fact, a co-debtor—not a creditor. In any event, in addition to the Creditor Matrix omitting a car lender, the taxing authorities, and a rental car company, the Debtor omitted a very large litigation creditor, 1st Source Bank, who filed one the Creditors' Motions that is further addressed below.

Finally, with regard to the Debtor's SOFA, it was sparsely completed—with the Debtor simply checking "no" for most questions (*i.e.,* Questions 3; 5-8; 10-13; and 15-28) and providing no answer at all at Question 9 (*i.e.,* the question that inquires whether a debtor has been party to any lawsuit in the year before bankruptcy).

**IV. The Creditors' Motions and Trustee's Pleadings.**

The Creditors' Motions and Trustee's Pleadings alleged some ugly facts. The Debtor never filed any pleading refuting these facts. Nor did the Debtor or his counsel refute the supporting

evidence presented at the ultimate hearing on the Creditors' Motions. The Creditors' Motions and Trustee's Pleadings are summarized below.

1. <u>The Motion to Dismiss Case of 1st Source Bank (the "1st Source Motion")</u>.

Recall that 1st Source Bank was not listed in the Debtor's Schedules, SOFA, or Creditor Matrix. It did not get formal notice of the bankruptcy. 1st Source Bank nevertheless learned of the Case and filed a 312-page motion to dismiss (including attachments), arguing that the Case constituted a bad faith filing: "Debtor Jakim Edward Pearson a/k/a William Harold ("Debtor") is an egregious repeat bankruptcy filer who has a pattern and practice of gaming the court system to avoid responsibility for his fraudulent conduct. This Court should not tolerate such flagrant behavior; the instant bankruptcy case should be dismissed with prejudice for at least five (5) years."

In the 1st Source Motion, it went on to represent that, despite the Debtor obtusely representing in his Voluntary Petition that he had filed only one prior bankruptcy case in the eight years before the current Case, ***the Debtor had, in fact, filed four prior cases in the last eight years in his own name, and a total of 15 bankruptcy cases were filed by him during his lifetime (two of which actually appear to have been filed in the name of other people with his assistance or involvement, at a time when he was barred from filing)***. 1st Source Bank attached information from some of these prior cases to its motion. All of these prior cases were filed in the Northern District of Georgia. Listed below are the cases that the Debtor filed in the eight years before this Case was filed, that were not disclosed and should have been:

A. Case No. **12-65926-MGD-13,** filed on June 27, 2012 and dismissed with prejudice for 180 days on September 18, 2012, pursuant to a Trustee's Objection to Confirmation and Motion to Dismiss Case with Prejudice. Debtor proceeded *pro se* in this case and did not appear at the hearing on the objection.

B. Case No. **13-69371-MGD-13**, filed on September 3, 2013 was dismissed on October 21, 2013, pursuant to Chapter 13 Trustee's Motion to Dismiss Pursuant to 11 U.S.C. §§109(e) and 109(h) for exceeding debt limits. Debtor proceeded *pro se* in this case and failed to appear at the hearing on the motion.

C. Case No. **14-53958-MGD-13**, filed on February 28, 2014 and converted to a Chapter 7 on May 6, 2014. The Debtor entered into a Stipulation and Written Waiver of Discharge with the United States Trustee, which was approved by the court on November 6, 2014. The case later closed without a discharge on February 6, 2015. Debtor was represented by an attorney named George M. Geeslin in this case after the Debtor's prior attorney withdrew as counsel.

D. Case No. **19-62157-PWB-13**, filed on August 5, 2019, and dismissed on September 13, 2019, due to the Debtor's failure to file required information. Debtor was represented by an attorney named Joy Chatman in this case.

In addition to these four undisclosed bankruptcy cases, 1st Source Bank also described in the 1st Source Motion a state court lawsuit in Georgia in which it had been recently engaged with the Debtor, which was not disclosed in SOFA Question #9 or anywhere else. The lawsuit involves allegations that the Debtor made numerous fraudulent and false representations to 1st Source Bank, forged numerous titles and bills of sale, and misappropriated at least $923,943.12 of 1st Source Bank's loan funds and failed to return those funds, after being required to do so by an order of a Georgia state court. Apparently, this bankruptcy Case was filed on the eve of a hearing at which sanctions were being considered against the Debtor by the Georgia state court. Strangely, the Debtor removed this Georgia lawsuit to an Indiana federal court after this bankruptcy Case was filed. Also, 1st Source Bank identified aliases allegedly used by the Debtor in his dealings with 1st

Source Bank (namely "William Harold" purporting to be Vice President of a company called New Age Transcorp Inc.). Finally, 1st Source Bank also identified various omissions in the Schedules and SOFA pertaining to certain companies for which the Debtor has been an officer, director, or manager.

2. The Truist Bank Motions to Lift Stay (the "Truist Motions").

The Truist Motions revealed more troubling information, including not just serial bankruptcy filing, but Truist Bank's own tortured history of playing "catch me if you can" with the Debtor. In the Truist Motions, Truist Bank represented that the Debtor has filed or orchestrated at least fifteen (15) bankruptcy petitions during his lifetime,[17] including some using different aliases (*e.g.,* Jay H. Overton-Bay; J.H. Overton-Bay) and ***some using different social security numbers*** (the current Case was filed using a social security ending in 2411; the Debtor has filed some of his other bankruptcy cases using social security numbers ending in 5558 and 2422). All of these bankruptcy filings were allegedly timed to prevent foreclosure on his Stone Mountain Home.[18] To be exact, there appear to be 13 bankruptcy cases filed by the Debtor and two others

[17] Cases filed by the Debtor prior to the previous eight years: 1) Case No. 94-73632-SWC-11 filed *pro se* on October 3, 1994, with the alias Jay H. Overton-Bay, using a social security number ending 5558, terminated on February 27, 1995; (2) Case No. 96-71827-SWC-13, filed *pro se* on August 2, 1996, with the alias J.H. Overton-Bay, using a social security number ending 5558, terminated on December 20, 1996; (3) Case No. 01-60020-ADK-13, filed *pro se* on January 2, 2001, with the name J.E. Pearson, using a social security number ending 2422, dismissed on March 9, 2001; (4) Case No. 04-90826-MHM-13, filed on February 2, 2004, in the name of J.E. Pearson, aka Jakim Edward Pearson, aka Jay Edward Pearson, aka J. Edward Pearson, aka J.H. Overton-Bay, aka James Hezekiah Overton-Bay, using a social security number ending 2422, dismissed on October 7, 2004; (5) Case No. 04-80283-MHM-13, filed on December 6, 2004, in the name of Debtor, Jakim Edward Pearson, aka J.E. Pearson, aka Jay Edward Pearson, aka J. Edward Pearson, aka J.H. Overton-Bay, aka James Hezekiah Overton-Bay, using a social security number ending 2411, dismissed on May 9, 2005; (6) Case No. 07-62203-MHM-13, filed *pro se* on February 6, 2007, using the name Jakim Edward Pearson, disclosing no aliases, and using a social security number ending 2411, dismissed on April 30, 2007; (7) Case No. 08-65566-MHM-13, filed *pro se* on March 27, 2008, using the name Jakim Edward Pearson, disclosing no aliases, and using a social security number ending 2411, dismissed with prejudice on July 8, 2008 with a 910-day bar to re-filing; (8) Case No. 11-55651-MGD-13, filed *pro se* on February 25, 2011, with the name of Jakim Edward Pearson, disclosing no aliases, and using a social security number ending 2411, converted to a Chapter 7 on April 12, 2011, and closed without discharge on September 22, 2011.

[18] A wise but irreverent lawyer once said that "bankruptcy exists so that people won't kill each other over debt." Assuming this is true, the Debtor in this Case has taken the concept a bit too far.

filed by individuals in collusion with, or via assistance from, the Debtor, after those individuals allegedly acquired an interest in the Stone Mountain Home.[19]

3. The Chapter 13 Trustee's Pleadings.

As mentioned earlier, the Chapter 13 Trustee filed his own Motion to Dismiss with Prejudice for Five Years and other notices of intent to dismiss for various case deficiencies. The Trustee's investigations seemed to have revealed exactly what the Creditors' Motions had likewise indicated—that the Debtor was a serial bankruptcy filer who had not disclosed several cases that he had filed, as required on one's Voluntary Petition. The Trustee argued that this Case constituted a bad faith filing.

**V. Mr. Wajda's Activity in the Case.**

As mentioned earlier, Mr. Wajda moved to be substituted in as counsel on the thirtieth day of this Case. Mr. Wajda's Rule 2016(b) Statement indicated that he received a $1,500 retainer (presumably postpetition). He never filed a motion for approval of a postpetition retainer.[20] Mr. Wajda never filed a motion to extend the automatic stay in this case—although the Debtor had another bankruptcy case dismissed within the one-year period prior to the Petition Date in this Case.[21] There is no way to know, based on the record in this Case, if Mr. Wajda thought that filing

[19] Truist Bank identified the following additional bankruptcy cases that have a connection to the Debtor: (1) Case No. 09-89174-CRM-13 filed by an individual named Lisha Allen, on November 2, 2009, in the Northern District of Georgia, Atlanta Division, *pro se*; in an affidavit accompanying her petition, she identified Jakim E. Pearson as a person who assisted her in preparing her bankruptcy petition; Lisha Allen claimed a fifty percent joint ownership in the Stone Mountain Home and she also claimed a mortgage debt owed to Truist Bank's predecessor, Suntrust Mortgage, despite having no contractual relationship with it; the case was converted to a Chapter 7 and Lisha Allen received a discharge on April 30, 2010; (2) Case No. 13-54639-CRM-13, filed by an individual named Michael Rashad on March 4, 2013, in the Northern District of Georgia, who claimed an interest in the Stone Mountain Home, pursuant to a May 11, 2011 quit claim deed executed by the Debtor, allegedly granting a five percent interest in it to Michael Blake Rashad (case dismissed on May 22, 2013).

[20] General Order § 2017-01, Standing Order Concerning All Chapter 13 Cases (Bankr. N.D. Tex. June 24, 2017) ¶ 21(d) ("An attorney may not receive a post-petition retainer or payment from the Debtor other than as specified in this General Order without leave of Court.").

[21] 11 U.S.C. § 362(c)(3).

such a motion would have been an exercise in futility, at such a late hour (and given certain bad facts), or if he did not do so because of a lack of due diligence—such that he did not realize the automatic stay in this Case was about to expire. Mr. Wajda moved to substitute in ***after*** the troubling, fact-laden Truist Bank Motions were filed but ***before*** the similarly troubling, fact-laden 1st Source Motion and Trustee Pleadings were filed. Mr. Wajda never responded to the Creditors' Motions or the Trustee's Pleadings. Mr. Wajda never amended the highly erroneous Voluntary Petition, the Schedules, the SOFA, or Creditor Matrix. Mr. Wajda did file a Chapter 13 plan that provided for a monthly plan payment of $5,826 per month, for 60 months, plus a direct payment of an unknown amount to a car lender on the Debtor's 2017 BMW vehicle. The plan reflected that the Debtor had $1,230.32 per month of disposable income, making feasibility of the plan that Mr. Wajda filed somewhat of a mystery. Then, as mentioned earlier, on the eve of a hearing on the Creditors' Motions, Mr. Wajda filed a Debtor's motion to dismiss his case voluntarily, simply stating "Based on the issues set forth in the various Motions to Dismiss and Notices of Intent to Dismiss filed in this Case Debtor has decided it is not beneficial to continue with this Case, and in the interest of preserving the Court's resources Debtor hereby requests that this Case is dismissed" (not indicating, by the way, whether he agreed to the five-year "with prejudice to refiling" bar that 1st Source Bank and the Trustee had requested and the proposed order he submitted did not contain any with prejudice language).

**VI. Appearances and Lack Thereof at the Hearing on the Creditors' Motions.**

A hearing was held on February 20, 2020 at 2:00 p.m. (the "2/20/20 Hearing") on the Creditors' Motions. Appearing at the 2/20/20 Hearing were: Tom Powers, Chapter 13 Trustee; attorney Jeff Fleming for Truist Bank; attorney Aaron Michelsohn for 1st Source Bank (along with a witness, Richard Rozenboom, Senior Vice President of 1st Source Bank); attorney Megan

Adeyemo for an unscheduled party-in-interest Engs Commercial Finance Co.; Nancy Resnick for the U.S. Trustee; and attorney Robert Nicoud as "appearance counsel"[22] for Mr. Wajda, for the Debtor. ***Mr. Nicoud represented that he was "engaged to appear at this hearing only."***[23] He was instructed to show up and not oppose dismissal. Mr. Nicoud further represented that he was called and given this assignment by a person named Lindsay Kyser, whom he had never met, but he believed to be an attorney working with Mr. Wajda. ***Mr. Nicoud never spoke with either Mr. Wajda or the Debtor about this Case or hearing***. Mr. Nicoud indicated that Mr. Wajda was physically present in California, although Mr. Wajda does have an office in Dallas and has a Texas law license. Ms. Resnick, for the U.S. Trustee, indicated that she had visited with Mr. Wajda about this Case and suggested that "if there was ever a case in which he should show up in person, it was this one."

**VII. <u>The Record Established at the 2/2/20 Hearing</u>.**

At the 2/20/20 Hearing, evidence was introduced that supported all of the allegations of the Creditors' Motion and the Trustee's Pleadings. It was, of course, unrefuted. 1st Source Bank, through its witness, Mr. Rozenboom, presented credible and compelling testimony and documentary evidence reflecting that the Debtor, in recent months, had made numerous fraudulent

---

[22] "Appearance counsel" is, of course, not a defined term in the Bankruptcy Code, National Bankruptcy Rules, or this court's local rules. However, various courts have explored the concept, with one judge using the following somewhat pejorative definition: "'Appearance attorneys' are attorneys who, at the request of the debtors' chosen attorney, appear and attempt to represent debtors at meetings of creditors and hearings on behalf of the debtors' attorney. An appearance attorney is neither a partner nor an associate at the law firm retained by the debtor. Rather, appearance attorneys are solo practitioners who generate income typically by contracting with multiple firms to represent their clients at proceedings at the courthouse. These lawyers are almost never disclosed to the court prior to their appearance, and debtors are often unaware that an appearance attorney will be representing them until they meet the attorney—usually mere minutes before a hearing or a meeting of creditors begins." *In re Bradley,* 495 B.R. 747, n.1 (Bankr. S.D. Tex. 2013).

[23] One court has noted that "appearance counsel" seems to be an inappropriate term because counsel is not just "appearing"—they are representing the client as his or her attorney. Thus, a more apt phraseology than "appearance" counsel might be "substitute" or "associated" counsel. "Even though this arrangement may be for a limited purpose or duration, the second attorney is, for that time and purpose, the attorney who is representing the client." *In re Olson*, 2016 WL 3453341, at *5 (Bankr. D. Idaho June 16, 2016).

and false representations to 1st Source Bank, forged numerous titles and bills of sale in connection with trucks that were supposed to be purchased with 1st Source Bank's loan proceeds and pledged to be its collateral, and misappropriated at least $923,943.12 of 1st Source Bank's loan funds—while holding himself out to be an individual named "William Harold, Vice President of New Age Transcorp, Inc." Later investigations revealed that "William Harold" was, in fact, the Debtor, Jakim Pearson. To be clear, the borrower on the 1st Source Bank lending was an entity called "New Age Transcorp, Inc.," of which a "William Harold" purported to be a vice president and point person on the loan, and after problems erupted with the loan, it was discovered that William Harold was, in fact, Jakim Pearson. The parties had been in the midst of contentious litigation regarding this loan and alleged fraud when the Debtor filed this Case—with no disclosure of either the litigation or 1st Source Bank in his bankruptcy paperwork, and no notice to 1st Source Bank.

The unrefuted allegations in the Creditors' Motions, the Trustee's Pleadings, and the evidentiary record presented at the 2/20/20 Hearing, showed a pattern of serial bankruptcy filings, omissions, and inaccuracies on sworn bankruptcy paperwork, and apparent bank fraud. The record not only seemed indicative of bad faith, warranting a dismissal with prejudice of this Case, but also warranting a criminal referral for investigation of bankruptcy fraud on the part of Jakim Edward Pearson, Sr.—which this court will make.

## VIII. Follow Up Show Cause Hearing for Mr. Wajda.

While the end result of the 2/20/20 Hearing was that the court granted Truist Bank's stay relief motions[24] and granted 1st Source Bank's motion to dismiss the Case with prejudice for five years, the court has found it appropriate to retain jurisdiction over this matter and schedule yet

[24] The court actually confirmed that there was no longer a Debtor stay in place, although the court concluded that there was arguably a co-debtor stay in place and found cause to lift the co-debtor stay.

another hearing, at which ***Mr. Wajda is directed to appear and show cause*** whether certain procedures he has employed for this Debtor (and/or perhaps others) are potentially inconsistent with the Bankruptcy Code, Rules and other applicable authority and may need to be remedied at least prospectively, if not retrospectively.

**IX.   The Apparent "MO" for this Case and Others.**

The U.S. Trustee reported at the 2/20/20 Hearing that yet a different "appearance counsel" (William Rossini) showed up with the Debtor at the section 341 meeting of creditors. Thus, two "appearance attorneys" were used in this Case—one at the section 341 meeting and one at the 2/20/20 Hearing. The U.S. Trustee further reported that this Case is representative of how Mr. Wajda regularly practices—in other words, whenever there is a need to attend a section 341 meeting or appear in court, he recruits other attorneys to appear for him. Mr. Wajda has filed 52 bankruptcy cases in the Northern District of Texas and more than 100 bankruptcy cases collectively in the other three districts of Texas. The U.S. Trustee also indicated that Mr. Wajda does business with, or is employed by, a firm known as RecoveryLaw.com, which is a "national internet firm" where debtors apparently never meet with an attorney—all interaction is by internet and phone—and RecoveryLaw.com defers the handling of any section 341 meetings or court hearings to "appearance counsel." The U.S. Trustee believes that Mr. Wajda has no real brick and mortar office locally—rather, his address is an office suite-sharing situation where he is never present.

The Chapter 13 Trustee represented at the 2/20/20 Hearing that the Debtor gave very vague answers to questions posed to him at the Section 341 Meeting. He said he had not read or signed the Chapter 13 plan that was filed on his behalf. He said he had not filed a tax return since year 2013. When asked if he had filed other bankruptcy cases with different names or social security

numbers, he said he "might have" or "did not remember." The Chapter 13 Trustee pointed out that the Debtor's plan had not been served on all required parties—conspicuously missing were any taxing authorities.

## X. The Court's Specific and Broad Concerns.

In this Case, the court has specific concerns and also broader concerns. The specific concerns are as follows: (a) a $1,500 ***post***petition retainer for which court approval was never requested or obtained;[25] (b) no motion to extend automatic stay was filed; (c) the Rule 2016(b) Statement merely stated "Wajda & Associates may use a local counsel at the 341(a) meeting. Approximately $100-$250 is paid for such appearances. This will result in no additional cost to the Debtor"[26]—the court does not believe this is adequate disclosure of what is tantamount to engaging local counsel or co-counsel; (d) no amendments were ever filed to the woefully erroneous bankruptcy paperwork; (e) a nonsensical plan was filed; and (f) the Debtor's counsel's obligation to represent the Debtor at the section 341 meeting and 2/20/20 Hearing was essentially farmed-out to local attorneys who were ill-informed about the Case and for which there was no Rule 2016(b) Statement on file. The broader concern is: ***how much time was spent with this Debtor and what was the nature of those interactions?*** This Debtor was a real problem. Did Debtor's counsel spend enough time to even realize this before cutting bait and running (essentially leaving ill-informed local counsel standing by to address the mess)?

## XI. The Internet-Based Law Firm Model as Used Here.

As noted above, the court has many questions and concerns. Did anyone personally meet or meaningfully communicate with the Debtor regarding his very deficient Voluntary Petition,

[25] ECF No. 21, Ex. A. General Order § 2017-01, Standing Order Concerning All Chapter 13 Cases (Bankr. N.D. Tex. June 24, 2017) ¶ 21(d)

[26] ECF No. 21, Ex. A.

Creditors Matrix, Schedules, and SOFA, so as to ascertain the amendments that might be needed? Did anyone personally meet or meaningfully communicate with the Debtor to prepare him for the sworn testimony he would have to give at the section 341 meeting (if so, who, how, and when)? How much pre-engagement contact generally occurs with clients (and what kind—email, phone calls, other)? Is such contact adequate, quality, counseling time? Is counsel getting a good financial picture of each client, so as to assure the client's awareness of the importance of correctly completing bankruptcy documents? Is Wajda & Associates, A.P.C. and its attorneys fulfilling the role of a trusted advisor to clients? The practice of consumer debtor representation is more than mere form-filling.

This court does not mean to cast aspersions on a wide-spread basis on all Internet-Based Law Firms. Maybe there are some doing everything right. But this all seems very different from a large, traditional law firm with a national network of offices with attorneys licensed to practice in various jurisdictions. As one commentator articulated, "When a client deals with a single firm, it is relying on the firm to match it with an attorney who is most qualified to the task at hand, and for the firm to supervise and provide quality control over its attorneys. Because attorneys are not commodities, a law firm brings together a grouping of individuals with different skills held together by the reputation of the enterprise."[27] The firm is accountable. "The Internet-based law firm is an attempt to apply the [Amazon-type] e-commerce model to the practice of law and differs from the traditional law firm models."[28] An Internet-Based Law Firm may refer to itself as a "national firm," but it really is not. While local "appearance attorneys" may have some prior

---

[27] Sather, *supra* note 1, at 38.
[28] *Id.*

relationship with the firm, he/she is engaged on a case-by-case basis and has his/her own independent practice. Which brings the court to the whole topic of "appearance counsel."

## XII. A Few Words About the Concept of "Appearance Counsel."

It appeared to the court that Mr. Wajda sent completely unprepared appearance counsel to a hearing where serious civil and potentially criminal allegations were being made and the Debtor faced a five-year filing bar. ***Was it really the best strategy to not file responsive pleadings, not have the Debtor show up, and send "appearance counsel" who was a stranger to the Case?***

The court is concerned about sections 329 and 504 of the Bankruptcy Code as well as Bankruptcy Rule 2016. Under section 329(a), any attorney representing a debtor in, or in connection with, a case shall file a statement of the compensation paid or agreed to be paid for the services rendered or to be rendered by that attorney and the source of the compensation. This provision is implemented by Rule 2016(b), which provides:

> Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code, including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed.

The court believes that these provisions require more than simply indicating, "Wajda & Associates may use a local counsel at the 341(a) meeting. Approximately $100-$250 is paid for such appearances. This will result in no additional cost to the Debtor." ***Rule 2016(b) requires disclosing who the contemplated second attorney is and what exactly he/she will be paid. And***

***the second attorney is affirmatively obligated to file his/her own Rule 2016(b) statement in each case.***[29]

This court is inclined to agree with certain other courts who have balked at the notion of "appearance counsel."[30] "Appearance counsel" is not really a "thing." There is such a thing as local counsel, special counsel, co-counsel, and substitute counsel. But what exactly would the role of "appearance counsel" be?[31] Showing up in a suit, when one has never talked to the client and cannot meaningfully counsel the client or address the court's and opposing counsel's questions, is not acceptable, as a general rule.[32] "A lawyer-client relationship is not merely contractual."[33] Attorneys are not fungible,[34] nor are clients. The Texas Rules of Professional Conduct invoke professional and ethical responsibilities in a lawyer-client relationship. Among other things, this requires providing competent representation following adequate preparation even in the context of a "limited" appearance. In the Case at bar, the notion of "appearance counsel" denigrated the importance of the role of a consumer debtor's counsel. Evidence was put forward at the 2/20/20 Hearing that was so bad that the court felt the need to make a criminal referral.

The court is left wondering what Mr. Wajda has accomplished in this Case for his never-approved $1,500.00 postpetition lump-sum attorney fee? The horribly erroneous bankruptcy

---

[29] Among other things, a client (not just the court and parties) is entitled to know what attorney, other than the one he hired or communicated with over the phone or internet, might be actually showing up at court or at a section 341 meeting.

[30] *See, e.g., In re D'Arata*, 587 B.R. 819, 826 (Bankr. S.D.N.Y. 2018) ("appearance counsel can promote a lack of accountability: . . . [t]he court overseeing a bankruptcy case must know who speaks for a debtor and whom it can hold accountable for any improprieties in the process") (internal citations omitted).

[31] *See Olson*, 2016 WL 3453341 at *8 ("the term 'appearance' counsel is not apt; its use is an error of comprehension as well as syntax. The adjective 'appearance' . . . effectively demeans the noun 'counsel.'").

[32] The court realizes that attorneys sometimes have conflicts, get sick, or go on vacation and ask other attorneys to cover for them. This is normal life and is to be expected on occasion. This is not what is going on in the Case at bar.

[33] *Olson*, 2016 WL 3453341 at *6.

[34] *Bradley*, 495 B.R. at 808.

paperwork was never amended. A nonsensical plan was filed but never got off the ground. Mr. Wajda sent "appearance counsel" to the Section 341 meeting and to the 2/20/20 Hearing, each of whom had never met with the Debtor. What does counsel do with a problem-riddled client such as the Debtor in this Case? The court is not sure, but certainly you don't take $1,500.00, pass the buck to "appearance counsel," and cut bait and run. The court was concerned about a complete lack of accountability in the Case at bar. The Debtor and its counsel of record were nowhere to be found when ugly facts surfaced.

In closing, the court believes it bears reminding that the American Bar Association's Model Rule of Professional Conduct 1.3 requires that a lawyer must "act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf." Moreover, in the *Dondi* opinion, the District Court for the Northern District of Texas stated:

"[W]e adopt the following as standards of practice to be observed by attorneys appearing in civil actions in this district:

(A) In fulfilling his or her primary duty to the client, a lawyer must be ever conscious of the broader duty to the judicial system that serves both attorney and client.

(B) A lawyer owes, to the judiciary, candor, diligence and utmost respect.

. . .

(D) A lawyer unquestionably owes, to the administration of justice, the fundamental duties of personal dignity and professional integrity."[35]

Wherefore, the court will hold a hearing on **June 29, 2020 at 1:30 p.m.,** at which time attorney Nicholas Wajda is directed to appear in person and **SHOW CAUSE** whether the practices

[35] *Dondi Properties Corp. Commerce Sav. & Loan Ass'n*, 121 F.R.D. 284, 287-88 (N.D. Tex. 1988).

described herein are consistent with the Bankruptcy Code, Rules and other applicable authority and, if not, how such matters should be remedied at least prospectively, if not retrospectively.

**IT IS SO ORDERED.**

**### END OF ORDER ###**